J-S24019-18

2018 PA Super 154

| WADE SHANER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CASEY HARRIMAN, | : | |
| | : | |
| Appellant | : | No. 1488 MDA 2017 |

Appeal from the Order Entered, August 29, 2017,
in the Court of Common Pleas of Lycoming County,
Civil Division at No(s):  16-20, 669.

BEFORE:  OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

OPINION BY KUNSELMAN, J.:                    **FILED JUNE 07, 2018**

In this matter, Casey Harriman appeals from an order entered after his indirect contempt conviction for violating a Protection From Abuse ("PFA") order.  Because there is no evidence Harriman acted with the requisite wrongful intent, nor is there evidence Harriman had constructive possession of a firearm, we reverse the conviction and vacate the judgment.

The record reveals the following pertinent history:  Recent times have not been peaceful for Harriman and his extended family, who live next door.  One of those family members, Wade Shaner, whose exact familial relationship is not discernable from the record, obtained a temporary PFA order against Harriman.  As a result of this temporary order, Harriman relinquished his firearms.  In doing so, he signed a form certifying that he did not "possess or have access to any firearms which [he] owns, borrowed or otherwise have

control of." **See** Commonwealth's Exhibit 3. The trial court entered a subsequent final PFA order pursuant to the consent of Shaner and Harriman. The final order, dated May 31, 2016, precluded Harriman from "possessing, transferring or acquiring any firearms" for the duration of the two-year protection order.

Familial in-fighting continued. In June 2017, deputies from the Lycoming County Sheriff's Department sought to serve Harriman with a new and separate PFA. On their way to Harriman's property, they received a dispatch call from their sergeant that a tip had just come in alleging Harriman was still in possession of a firearm. The source of the tip was not revealed either to the deputies, nor was it disclosed in the record. The deputies called the Pennsylvania State Police to assist, and Trooper Tyler Diggan was dispatched. Law enforcement arrived at Harriman's home, but no one answered the door. Still seeking to serve Harriman with the PFA paperwork, Trooper Diggan noticed a "pole shed" approximately two hundred feet from Harriman's door.[1] The pole shed was actually on the neighboring property, which belonged to Harriman's grandmother-in-law. Trooper Diggan stepped into the shed to look for Harriman where he observed a .22 rifle hanging on the wall at eye level. The gun, later determined to be unloaded, was secured by one of the deputies, but no care was taken to preserve the weapon for

---

[1] The pole shed has been described in the record as partially open structure, where the sides are walled but where the front and back are open such that one could see through the structure.

future fingerprint testing. They could not determine who owned the rifle, which was described to be weathered, nor how long it had been there.

At some point, Harriman came home and was taken into custody and arraigned pursuant to 23 Pa.C.S.A. § 6113. Harriman told law enforcement that the shed did not belong to him, but that he has stored his property in it before. On August 25, 2017, the trial court found Harriman guilty of indirect criminal contempt of the PFA order "by having access" to the rifle found in the pole shed. He was ordered to pay a $300 fine plus prosecution costs.

Harriman submits this appeal and this single issue, which we restate verbatim:

> Whether the Court of Common Pleas, in finding that [Harriman] had access to a firearm while barred from possessing, transferring or acquiring firearms under a valid [PFA] Order, may convict [Harriman] of indirect criminal contempt without explicitly finding that [Harriman] acted or failed to act with wrongful intent.

Harriman's Brief, at 6.

In reviewing whether the evidence was sufficient to support a conviction for indirect contempt, "we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Felder*, 176 A.3d 331, 333-334 (Pa. Super. 2017) (*quoting* *Commonwealth v. Taylor*, 137 A.3d 611, 614 (Pa. Super. 2016)

- 3 -

(*en banc*) (citation and quotation omitted). In applying the above test, "we may not weigh the evidence and substitute our judgment for the fact-finder." ***Commonwealth v. Brumbaugh***, 932 A.2d 108, 109 (Pa. Super. Ct. 2007) (citation and quotation omitted). Finally, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Id***. at 110.

A finding of criminal contempt must be supported by the following four elements:

> 1. The court's order or decree must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited;
>
> 2. The contemnor must have had notice of the specific order or decree;
>
> 3. The act constituting the violation must have been volitional; and
>
> 4. The contemnor must have acted with wrongful intent.

***Felder***, 176 A.3d at 334 (*citing* ***Commonwealth v. Walsh***, 36 A.3d 613, 619 (Pa. Super. 2012).). Here, there is no question the Commonwealth satisfied the first two elements. The crux of this case is whether Harriman committed an action of his own volition while possessing the requisite wrongful intent.

The trial court framed the issue in very narrow terms, namely: whether Harriman had ***access*** to the firearm. This is not the correct inquiry. The Final PFA Order prohibits Appellant from "possessing, transferring, or acquiring" firearms. By focusing on "access," the Commonwealth seemed to make a case for "constructive possession." The "access" language comes from a

standard form Harriman filled out when he relinquished his firearms to the sheriff's department at the time of the Temporary PFA Order, which was then replaced by the Final PFA Order. The form, signed by Harriman, was read into the record and states:

> I [Harriman] do hereby certify that I do not currently possess or have access to any firearms (handgun, rifles, shotguns) which I own, borrowed or otherwise have control of. I understand that I have been ordered by a judge to refrain from having in my possession or control any firearm until further order of the Court and that I subject myself to contempt sanctions and/or criminal charges if I disobey a Court order.

N.T., 8/25/17, at 15-16.

Perhaps this standardized language sought to warn defendants that "constructive possession" of firearms still qualifies as possession. With respect to constructive possession, we have held:

> When contraband is not found on the defendant's person, the Commonwealth must establish "constructive possession," that is, the **power to control** the contraband **and the intent to exercise that control**. **Commonwealth v. Valette**, 531 Pa. 384, 613 A.2d 548 (1992). The fact that another person may also have control and access does not eliminate the defendant's constructive possession.... As with any other element of a crime, constructive possession may be proven by circumstantial evidence. **Commonwealth v. Macolino**, 503 Pa. 201, 469 A.2d 132 (1983). The requisite knowledge and intent may be inferred from the totality of the circumstances. **Commonwealth v. Thompson**, 286 Pa.Super. 31, 428 A.2d 223 (1981).

**Commonwealth v. McClellan**, 178 A.3d 874, 878 (Pa. Super. January 26, 2018)(*citing* **Commonwealth v. Haskins**, 450 Pa.Super. 540, 677 A.2d 328,

- 5 -

330 (1996), ***appeal denied***, 547 Pa. 751, 692 A.2d 563 (Pa. 1997)(emphasis added). Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. ***Id.*** (citation omitted).

At the contempt hearing, Harriman testified that the rifle was not his and that he did not know it was in the pole shed. *See* N.T., 8/25/17, at 31-32. Harriman conceded, however, that he has used the shed to store his property in the past. ***Id.*** Doris Jordan, owner of the property on which the pole shed is located and grandmother-in-law of Harriman, also testified that the rifle was not hers. ***Id.***, at 23. She testified that she knew Harriman used the shed, but after a land deal between Harriman and Jordan fell through, Jordan told Harriman in June 2016 to "stay off my property and get all his stuff off." ***Id.***, at 27. Jordan testified that Harriman did not remove all of this things, as some possessions were still in the barn on the day before the hearing.[2] ***Id.***, at 28. In June 2017, when Deputy Trautman took possession of the rifle and Harriman was taken into custody, Harriman said that he did not know the gun was in the pole shed. He further stated that while he does not own the structure, he stored in the shed his "skid steer" and his son's "four-wheeler." ***Id.***, at 38.

_____

[2] Jordan testified that Harriman's horses were still in the barn. It unclear whether the barn in question was the pole shed, as the terms were often used interchangeably and Jordan had a difficult time identifying the structures on the properties on the aerial photographs shown to her on cross-examination. She said she did not know what else besides the horses were still there.

The trial court accepted the fact that the rifle was not Harriman's firearm and that he complied when he was originally ordered to relinquish his guns in 2016. *Id.*, at 42. However, the trial court determined that Harriman did have access to the rifle because "he could be going back in that [pole shed] every day and looking at that gun saying it's not my gun; I don't have anything to worry about." *Id.* The trial court explained that Harriman had a duty to ensure he had no access to any firearms. The trial court hypothesized that if Harriman's father is a gun owner, Harriman would have to arrange that his father locked up the weapons before Harriman could come over for dinner. *Id.* The deputy testified that on prior occasions he has taken the firearms of a defendant's roommate in order to allow the defendant to reside there. *Id.,* at 43. Those are not the circumstances of this case, and this is not the correct standard to adjudicate the case.

The trial court further determined that Harriman's "act of volition" was his failure to have the gun removed from the shed. *See* Trial Court Opinion, 11/27/17, at 5. Even if we assume Harriman continued use of the forbidden shed constituted a volitional act, thereby satisfying the third element of contempt, we cannot conclude that the evidence of record established beyond a reasonable doubt that Harriman had the requisite wrongful intent. Wrongful intent can be imputed by virtue of the substantial certainty that by choosing an action, the defendant would know he would be in violation of the PFA Order. *See Commonwealth v. Brumbaugh,* 932 A.2d 108, 111 (Pa. Super. 2007)("Wrongful intent can be imputed by virtue of the substantial certainty

that by choosing to accept the victim's invitation to travel with her in the same vehicle to a party, he would be in contact with her in violation of the PFA Order."). Harriman could not have been substantially certain that his continued use of a shed would violate the PFA Order.

Moreover, the trial court did not assert that Harriman had possession or constructive possession of the weapon. The trial court referred to Harriman's contempt as "*di minimis*" (sic) and an "incredibly technical violation" *Id.*, at 41; 43. By this same reasoning, Harriman would be in contempt if he entered any retail store that sells firearms. Neither the Commonwealth nor trial court understood that wrongful intent was a necessary element of the offense. *See id.*, at 38-39. In fact, the trial court noted that perhaps the gun was planted by those who would want to see Harriman violate the order. *Id.*, at 42. The trial court only considered "access." Even if we agree that Harriman had access to the shed (and thus access to the gun, and thus control of the gun), despite clear testimony he was forbidden from using the shed, there is no evidence that Harriman had "intent to exercise that control." *McClellan*, 178 A.3d at 878. The Commonwealth cannot prove that Harriman had constructive possession of the rifle.

Because the Commonwealth did not satisfy all the elements of indirect criminal contempt, nor could the Commonwealth prove Harriman had constructive possession of the firearm, we must vacate the order entered and reverse the conviction of indirect criminal contempt.

Order vacated. Jurisdiction relinquished.

Musmanno, J. joins this opinion.

Olson, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/07/2018